FLOYD R. GIBSON, Senior Circuit Judge:
 

 Troy Lee Shearer appeals from his conviction on one count of conspiracy to import approximately 30,000 pounds of marijuana into the United States, and one count of conspiracy to possess with intent to distribute approximately 30,000 pounds of marijuana. The district court
 
 [1]
 
 sentenced Shearer to two ten year sentences to run concurrently, and imposed a $10,000 fine. On appeal Shearer makes four separate arguments that his Sixth Amendment right to a fair trial was violated. We affirm Shearer’s conviction.
 

 I. FACTS
 

 The case against Shearer and the other conspirators was developed through the investigative work of a confidential informant, Ronald Kell. In 1983 Kell disclosed to United States Customs officials his prior drug smuggling activities, and offered to cooperate with Customs in investigating ongoing smuggling. Kell went to Shearer’s home in Fort Pierce, Florida in November 1984 to attempt to locate a Chuck Carver, whom Kell believed might be managing a smuggling operation. While at Shearer’s home, Kell told Shearer of his financial difficulties, and Shearer discussed the possibility of Kell working on some smuggling operations. Shearer also asked Kell if he knew where to locate a large boat, because he knew some people interested in putting together a trip. Shearer gave Kell $500 for expenses while he was looking for a suitable boat. Kell then went to Louisiana to look for a boat, and reported his findings to Shearer upon his return.
 

 Throughout Kell’s investigation, as many as forty of Kell’s phone conversations were taped and later played at trial. Kell was subject to close supervision by the federal agencies, Customs and the Drug Enforcement Administration (DEA), with whom he was cooperating; for example, he was required to maintain almost daily contact with Customs. Federal agents conducted surveillance of all meetings between Kell and any conspirators, searching Kell’s person and his car before the meetings and interviewing him afterwards as well. At these follow-up meetings Kell would brief the agents as to his conversations with the
 
 *1539
 
 conspirators and would hand over any evidence obtained, such as money.
 

 Kell met with Shearer at his Fort Pierce home on November 12th and again on November 16th, at which time Shearer gave Kell $5,000 towards the purchase of a boat in Louisiana, the M/V “Sunshine.” Kell went back to Louisiana to make the down payment on the boat, keeping in touch with Shearer by phone while away. Kell then returned to Fort Pierce, where he met with Shearer at his home on December 4, 1984, to discuss progress on the M/V Sunshine. Shearer paid Kell $4,000 towards purchase and renovation of the M/V Sunshine. Kell again went to Shearer’s Fort Pierce home on December 18th, where he, Shearer, and a man known to Kell only as “Jack” discussed the shape, range, and hauling capacity of the M/V Sunshine. Kell estimated that 80,000 pounds of marijuana could be carried on the boat, and in response to Shearer’s question, stated that cocaine could be hid on board. Shearer gave Kell an envelope containing $10,000, which Kell used towards purchase of the M/V Sunshine and for expenses.
 

 Following the December 18th meeting Kell again went back to Louisiana, spending the end of December 1984 and the first few days of January 1985 there. Kell returned to Florida, meeting with Shearer at his home on January 10th, where Shearer gave Kell a bag containing $29,960 in cash as further payment on the M/V Sunshine. On February 1st Kell met with Shearer and Newell Blankenbaker at Blankenbaker’s house. Shearer told Kell that the other organizers of the operation were coming up from Fort Lauderdale to discuss the trip, Kell’s fee, and the progress of the M/V Sunshine. Later that same day Kell, Shearer, and Blankenbaker were joined by Jack and two men known to Kell as “Charlie” and “Melvin.” At this meeting Shearer advised Kell that he was no longer working directly for Shearer, but was now working for Charlie. Shearer stayed at this meeting until Kell’s $350,000 compensation was agreed upon, and then left. Kell and the others present at the meeting discussed the preparation of the M/V Sunshine, the route to Colombia, and the unloading of the marijuana in Jacksonville. Charlie gave Kell $2,500 at this meeting.
 

 In February and early March 1985, Kell had several conversations and meetings with Jack, Melvin, Charlie, Blankenbaker, and two men identified to Kell as “Mike” and “Lester.” In one meeting with Blank-enbaker, Blankenbaker mentioned to Kell that Troy calls him every day. During this time period Kell received additional payments of $83,400 and $5,000 towards purchase and renovation of the M/V Sunshine, and for expenses. Kell also took two deliveries of marine electronics from Lester, and Melvin and Mike.
 

 On March 13, 1985, Kell accidentally blew his cover by inadvertently handing Melvin a set of his confidential informant notes along with documentation papers for the M/V Sunshine. Both Melvin and Mike, who were in a car with Kell, fled on foot; neither was apprehended.
 

 A four-count indictment was returned against Shearer, Blankenbaker, and John Richard Marshal (“Jack”) on April 10,1985. Count I contained the conspiracy to import charge, and Count II contained the conspiracy to possess with intent to distribute charge. The indictment alleged that both conspiracies ran from on or about November 3, 1984, through on or about March 13, 1985. Counts III and IV alleged that property used to facilitate the conspiracy was subject to forfeiture pursuant to 21 U.S.C. § 853(a)(2). Count III pertained to Shearer’s residence located at 241 Marina Drive, Fort Pierce, Florida, while Count IV related to Blankenbaker’s residence in Fort Pierce. On August 5,1985, Blankenbaker entered a guilty plea and Shearer’s trial as the sole defendant began. The jury returned a verdict of guilty against Shearer on Counts I and II on August 14th. The court declared a mistrial on Count III, the forfeiture count, when the jury could not reach a
 
 *1540
 
 verdict. After Shearer’s motions for judgment of acquittal and for a new trial were denied, Shearer filed this appeal.
 

 II. CONFIDENTIAL INFORMANT’S ALLEGED CONTINGENT FEE AGREEMENT
 

 Shearer argues first on appeal that the district court deprived him of his Sixth Amendment right to a fair trial by failing to direct a judgment of acquittal pursuant to the dictates of
 
 Williamson v. United States,
 
 311 F.2d 441 (5th Cir.1962). Shearer interprets
 
 Williamson
 
 to stand for the proposition that a contingency fee arrangement with a Government witness is not to be condoned when a danger exists that the witness’s testimony may be influenced by his pecuniary interest in the outcome of the proceedings. Here, confidential informant Kell received a $25,000 payment within two weeks prior to the trial from Customs for information and assistance he had provided during the investigation. Kell had also been paid a total of $6,000 over the course of the investigation by the DEA to cover his expenses. Customs agent Richard Nessosis testified that Kell would also be eligible to receive twenty-five percent of any money obtained by Customs from a forfeiture and sale of the M/V Sunshine. DEA agent Douglas Ball testified that he advised Kell in October 1984 that his agency compensated for information on a case by case basis depending on the class of violation investigated, whether the investigation led to any arrests and convictions, the number of violators arrested, and the value of assets seized.
 

 Kell’s own testimony as to how he believed he would be compensated indicated that he had “absolutely no idea” how much he might make, that he had made no agreement with the Government, and that no specific dollar amount had been promised to him. Kell did state that he believed that the DEA’s case by case method of remuneration would be based in part on the value of Shearer’s house, Blankenbaker’s house, and Marshal’s office, but he further stated that the maximum amount paid for participation by an informant was $50,000.
 

 Shearer also argues that apart from any monetary compensation Kell’s testimony was also tainted by the fact that Shearer owed Kell $200,000, and that Kell had admitted to several trafficking felonies for which he had never been prosecuted and for which the statute of limitations had not yet run. According to Shearer, the net effect of all the potential benefits Kell could receive from helping to convict Shearer — money, retribution, leniency— served to prejudice Kell’s testimony against him. That the substantive offenses in Counts I and II were tried along with the forfeiture in Count III exacerbated the problem, asserts Shearer, because Kell’s testimony was influenced by his desire to obtain a forfeiture of Shearer’s house and thus increase his potential “take” from the case. Shearer contends that Kell’s credibility was impermissibly affected by his interest in the case, and that because not enough corroborating evidence exists to sustain his conviction, his convictions on both Counts I and II should be reversed.
 

 After carefully considering the briefs and the record in this case, we conclude that no reversible error exists as to the admission of Kell’s testimony. In
 
 Williamson,
 
 the sole case relied on by Shearer, the former Fifth Circuit
 
 [2]
 
 expressed its concern that under certain circumstances the use of a confidential informant could lead to a situation akin to entrapment:
 

 [W]e cannot sanction a contingent fee agreement to produce evidence against particular named defendants as to crimes not yet committed. Such an arrangment might tend to a “frame up,” or to cause
 
 *1541
 
 an informer to induce or persuade innocent persons to commit crimes which they had no previous intent or purpose to commit. The opportunities for abuse are too obvious to require elaboration.
 

 311 F.2d at 444 (footnote omitted). Subsequent Fifth and Eleventh Circuit cases have interpreted
 
 Williamson
 
 to bar a contingent fee agreement with a confidential informant only when the Government preselects the individual who is to be the target of the informant’s investigation.
 
 See, e.g., United States v. Richardson,
 
 764 F.2d 1514,1520 (11th Cir.),
 
 cert. denied,
 
 — U.S. —, 106 S.Ct. 320, 88 L.Ed.2d 303 (1985);
 
 United States v. Carcaise,
 
 763 F.2d 1328, 1332 n. 11 (11th Cir.1985);
 
 United States v. Valle-Ferrer,
 
 739 F.2d 545, 546-47 (11th Cir.1984);
 
 United States v. Walker,
 
 720 F.2d 1527, 1540 (11th Cir.1983),
 
 cert. denied,
 
 465 U.S. 1108, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984);
 
 United States v. Yater,
 
 756 F.2d 1058, 1067 (5th Cir.),
 
 cert. denied,
 
 — U.S. —, 106 S.Ct. 225, 88 L.Ed.2d 226 (1985);
 
 United States v. Onori,
 
 535 F.2d 938, 942-43 (5th Cir.1976);
 
 United States v. Garcia,
 
 528 F.2d 580, 586 (5th Cir.),
 
 cert. denied,
 
 429 U.S. 898, 97 S.Ct. 262, 50 L.Ed.2d 182 (1976).
 

 In the case before us, unlike in
 
 Williamson,
 
 the Government had no hand in selecting Shearer as the focus of Kell’s investigation. It was only when Kell went to Shearer’s Fort Pierce home looking for Chuck Carver that Shearer enlisted Kell to search for a boat suitable for use in a smuggling operation. Indeed, Shearer does not contend that the Government specifically directed Kell to implicate him.
 

 As for the compensation received by Kell, he was paid a total of $31,000
 
 prior
 
 to trial for expenses and information. Coming as it did before Shearer’s trial, payment of this sum was not contingent upon conviction of Shearer.
 
 See, e.g., Carcaise,
 
 763 F.2d at 1332 (payment of expenses is not a contingent fee arrangement prohibited by Williamson);
 
 Garcia,
 
 528 F.2d at 586-87 (payment of subsistence allowance and reward to informant is permissible when informant has not been promised a specific sum to convict a particular person; although a heavy subsidy of informants requires scrutiny and is of dubious propriety, “it does not of itself require reversal”). The only other remuneration that Kell expected to receive was pursuant to the DEA’s case by case method, based on a number of factors. Kell stated that he had not been promised any specific sum, that the amount was to be based on several factors and determined “by whatever office of the Government that handles that,” that he “didn’t have the slightest idea” as to how the amount would be derived, and that the maximum paid was $50,000. From the DEA agent’s testimony as to the factors on which a reward is based under the case by case method, and Kell’s testimony as to his understanding of that method, it is clear that Kell’s payment was not contingent on Shearer’s conviction.
 
 See Richardson,
 
 764 F.2d at 1520-21;
 
 United States v. Gray,
 
 626 F.2d 494, 499 (5th Cir.1980),
 
 cert. denied,
 
 449 U.S. 1091, 101 S.Ct. 887, 66 L.Ed.2d 820 (1981).
 

 Although we find the arrangement with the confidential informant to be permissible in this case, we note that the amount paid to the informant is a large sum, properly subject to scrutiny by this court.
 
 See Garcia,
 
 528 F.2d at 587 (payment of $31,675 in eighteen months did not of itself mandate reversal, but amount did require scrutiny and created doubt “as to the propriety of the practice of so heavily subsidizing informants”).
 
 See also Gray,
 
 626 F.2d at 499. Kell was paid $31,000 for his full-time participation in a five-month undercover investigation that exposed him to possible danger, especially if the ruse had not fallen through before the planned trip to Colombia. Under the circumstances, then, we do not find the sum paid to Kell to be exorbitant. Nevertheless, we caution the Government against adopting any practice that may affect the credibility of informants. The Government is in the business of investigating and intercepting crime, not
 
 *1542
 
 initiating it. Because we find no violation of
 
 Williamson
 
 under the facts here, and in light of the evidence corroborating Kell’s testimony,
 
 [3]
 
 we reject Shearer’s argument that he was denied a fair trial.
 

 III. VENUE
 

 Shearer next argues that the district court erred in denying his motion for judgment of acquittal based on the absence of venue because the Government failed to prove by a preponderance of evidence that any conspiratorial act occurred within the Middle District of Florida. The district court reviewed the relevant venue case law and determined that in a conspiracy case, venue may be in any district in which “the Government can prove by a preponderance of the evidence that one of the co-conspirators passed through that district in furtherance of the conspiracy.” The court concluded that enough circumstantial evidence existed to establish venue to overcome a motion to dismiss and allow the issue of venue to go to the jury.
 

 The circumstantial evidence acknowledged by the court as tending to establish venue was two-fold. First, pursuant to Marshal’s direction, Kell received a delivery of marine electronics in Louisiana on February 7, 1985 from a man known as “Lester.” Lester was driving a vehicle with Florida tags that was registered to an address in Lake Worth, Florida, adjacent to a March 8, 1985 meeting place between Kell and the conspirators. Evidence established that the equipment was bought by Mel Taylor and Lester White in Fort Laud-erdale on February 4, 1985, for $10,000 cash. Marshal told Kell on February 7 that he had helped load the equipment into a truck, and that it had been driven to Louisiana from a location an hour and a half from Miami. Such a drive would require traveling through the Middle District of Florida. Second, the Government established at trial that Marshal flew from Miami to New Orleans for his February 6th meeting with Kell. A navigator for Eastern Airlines, on which Marshal flew, testified that a flight from Miami to New Orleans would necessarily pass over the Middle District of Florida. At the February 6th meeting between Marshal, Kell, and Melvin, Kell received $83,400 to finalize the purchase of the M/V Sunshine.
 

 Shearer argues that this evidence was insufficient to establish that any conspiratorial act occurred in the Middle District of Florida because no evidence exists that this equipment actually came through that district, or that the money paid to Kell on February 6th came from Marshal or was carried by Marshal on his plane trip from Miami. Further, Shearer contends that those cases that have allowed “pass over” situations — i.e., travel by land or air through or over a district — to vest venue have done so only when the travel has been in an attempt to possess contraband or deliver it.
 
 See, e.g., United States v. Mayo,
 
 721 F.2d 1084, 1090-91 (7th Cir.1983);
 
 United States v. Davis,
 
 666 F.2d 195, 200 (5th Cir.1982);
 
 United States v. Durades,
 
 607 F.2d 818, 820 n. 1 (9th Cir.1979);
 
 United States v. Schoor,
 
 597 F.2d 1303, 1308 & n. 7 (9th Cir.1979);
 
 United States v. Prueitt,
 
 540 F.2d 995, 1006 (9th Cir.1976),
 
 cert. denied,
 
 429 U.S. 1063, 97 S.Ct. 790, 50 L.Ed.2d 780 (1977);
 
 United States v. Williams,
 
 536 F.2d 810, 812 (9th Cir.),
 
 cert. denied,
 
 429 U.S. 839, 97 S.Ct. 110, 50 L.Ed.2d 106 (1976).
 

 In a conspiracy case, venue is properly found in any district in which an overt act is performed in furtherance of the conspiracy.
 
 United States v. Lewis,
 
 676
 
 *1543
 
 F.2d 508, 511 (11th Cir.),
 
 cert. denied,
 
 459 U.S. 976, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982). The Government bears the burden of supporting venue only by a preponderance of the evidence.
 
 United States v. London,
 
 714 F.2d 1558, 1564 & n. 9 (11th Cir.1983);
 
 Lewis,
 
 676 F.2d at 511. Although we recognize that the cases finding venue in “pass over” situations have all involved travel related to the pick-up or delivery of contraband, we think the two instances of travel through the Middle District of Florida discussed here were sufficiently part and parcel of the whole smuggling conspiracy to satisfy the venue requirement. Both the delivery of the marine electronics and Marshal’s flight to New Orleans to make the final payment on the M/V Sunshine were essential to the purchase and preparation of the vessel for the planned trip to Colombia. As such, both the land travel and the air travel were performed in the Middle District in furtherance of the conspiracy. Because both trips through the Middle District were established by a preponderance of the evidence, we find no error in the court’s denial of Shearer’s motion for judgment of acquittal based on the lack of venue.
 
 [4]
 

 IV. PROPOSED JURY INSTRUCTION
 

 Shearer’s next contention on appeal is that the district court deprived him of his right to a fair trial by denying his request for a perjurer instruction as to Kell’s testimony. Kell admitted on cross-examination that he had omitted income he had received from hauling contraband on income tax returns that he had signed under penalty of perjury. Shearer argues that he was entitled to an instruction that provided in part that “all testimony of an admitted perjurer should always be considered with caution and weighed with great care.” The court’s denial of this instruction, Shearer alleges, was not harmless error because Kell’s credibility was crucial to the Government’s case against him.
 

 “ ‘The refusal to give a requested instruction warrants a reversal only if (1) the [requested] instruction was substantially correct, (2) the requested instruction is not addressed in the charge actually given, and (3) the failure to give the requested instruction seriously impaired the defendant’s ability to present an effective defense.’ ”
 
 United States v. Fajardo,
 
 787 F.2d 1523, 1527 (11th Cir.1986) (quoting
 
 United States v. Lopez,
 
 758 F.2d 1517, 1521 (11th Cir.),
 
 cert. denied,
 
 — U.S. —, 106 S.Ct. 789, 88 L.Ed.2d 767 (1986)) (brackets in original). Assuming that the proposed instruction in question was substantially correct, the court’s refusal to give the instruction still does not warrant reversal of Shearer’s conviction. Although no perjurer instruction was given, the court did advise the jury as to the credibility of witnesses in general and the effect of impeachment testimony. The court further instructed the jury that “the testimony of one who provides evidence against a Defendant as an informant or for immunity from punishment or for personal advantage or vindication must always be examined and weighed by the Jury with greater care and caution than the testimony of ordinary witnesses.” Thus the jury was adequately alerted to the need to consider Kell’s testimony with extra caution. Further, because of the instructions given as to witness credibility, impeachment, and informant testimony, as well as defense counsel’s questioning of Kell as to the false statements on the tax returns and his emphasis on Kell’s perjury in his closing argument, Kell’s ability to present an effective defense was not impaired by the lack of a perjurer instruction.
 
 See United States v. Tamura,
 
 694 F.2d 591, 602 (9th Cir.1982) (court’s failure to instruct jury to weigh testimony of co-defendants with great care because both were admitted perjurers was not prejudicial when instruc
 
 *1544
 
 tions given on testimony of accomplices, impeachment by prior inconsistent statement, and felony convictions adequately cautioned the jury that the credibility of the co-defendants was open to question).
 
 See also United States v. Hayes,
 
 589 F.2d 811, 824 (5th Cir.),
 
 cert. denied,
 
 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979);
 
 United States v. Muscarella,
 
 585 F.2d 242, 252 (7th Cir.1978). Because the jury instructions as a whole adequately protected Shearer’s interests, we find no error in the omission of the perjurer instruction.
 

 V. SUFFICIENCY OF EVIDENCE ON CONSPIRACY TO DISTRIBUTE COUNT
 

 Shearer’s final argument on appeal is that insufficient evidence existed to support his conviction on Count II, the conspiracy to distribute marijuana count. Shearer contends that no separate or different evidence existed to satisfy a reasonable trier of fact beyond a reasonable doubt that Shearer had agreed or conspired to distribute the marijuana. Shearer points out that before Shearer told Kell that he would no longer be working for Shearer, all of the discussions among the conspirators had been about importation, not distribution. The Government erred, asserts Shearer, in arguing that if Shearer was guilty of conspiracy to import marijuana, he was necessarily guilty of conspiracy to possess marijuana with intent to distribute as well.
 

 Shearer’s argument is not well taken. This circuit has held that a jury may infer from a defendant’s participation in an importation conspiracy and the amount of marijuana involved that the defendant was also involved in a conspiracy to possess with intent to distribute the marijuana.
 
 United States v. Gort,
 
 737 F.2d 1560, 1564 (11th Cir.1984) (quoting
 
 United States v. Cuni,
 
 689 F.2d 1353, 1356 (11th Cir.1982) and
 
 United States v. Bulman,
 
 667 F.2d 1374, 1378-79 (11th Cir.),
 
 cert. denied,
 
 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982)). Shearer does not contend that the evidence was insufficient to convict him on the conspiracy to import Count I. In view of the large quantity involved in the importation project the district court did not err in denying Shearer’s motion for judgment of acquittal on Count II.
 

 VI. CONCLUSION
 

 Because we have carefully considered all of Shearer’s arguments and find none to be of merit, we affirm the conviction and judgment entered by the district court.
 

 Affirmed.
 

 [1]
 

 . Honorable George K. Sharp, United States District Judge for the Middle District of Florida.
 

 [2]
 

 . The Eleventh Circuit, in the en banc decision
 
 Bonner v. City of Prichard,
 
 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.
 

 [3]
 

 . Surveillance established that Kell received over $43,000 in cash at three meetings at Shearer’s Fort Pierce home in December 1984 and January 1985. In one conversation between Kell and Newell Blankenbaker, Blankenbaker detailed the planned smuggling voyage to Colombia and stated that Troy calls him every day. Additionally, James Wilson, who was married to Shearer’s niece, testified as to Shearer's prior organization of marijuana smuggling ventures to Colombia.
 

 [4]
 

 . We need not decide that the single act of a flight over a district is sufficient to confer venue when there are no other facts to support venue.